# In the United States Court of Appeals for the Seventh Circuit

JEROME DAVIS, VERONICA WALKER-DAVIS, DIAMONIQUE BYRD, ALLIE NELSON, AND LEWRANCE GANT,

Plaintiffs-Appellants,

*v.*

CITY OF CHICAGO,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of Illinois, Case No. 1:19-cv-03691
(Hon. Lindsay C. Jenkins)

## REPLY BRIEF OF APPELLANTS

Robert Pavich
PAVICH LAW GROUP, PC
30 West Monroe Street
Suite 1310
Chicago, IL 60603
(312) 690-8400
rpavich@pavichlawgroup.com

Diana K. Simpson
 *Counsel of Record*
Kirby Thomas West
Samuel B. Gedge
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
diana.simpson@ij.org; kwest@ij.org
sgedge@ij.org

*Counsel for Appellants*

# TABLE OF CONTENTS

Introduction ..........................................................................................................1

Argument ..............................................................................................................1

I.    Chicago's policy of conditioning the return of seized cars on the owners' pre-paying as-yet-unowed debts violates the Due Process Clause and the Fourth Amendment...........1

    A.    Due process prohibits Chicago from depriving people of their cars to leverage pre-payment of unowed penalties ...........................................................................2

    B.    The plaintiffs stated a claim that Chicago's holding their cars to leverage pre-payment of unowed penalties violates the Fourth Amendment.......................6

II.   Chicago's impound program contravened state and federal protections against excessive fines because, in its design, it penalized people with no regard for culpability.........................................................................................................7

    A.    The complaint plausibly alleged that Chicago's *in personam* penalties violated the federal Excessive Fines Clause ...........................................................7

    B.    Chicago's impound program violated Illinois's Proportionate Penalties Clause ..10

III.  Several of the district court's procedural rulings were error ............................................. 15

    A.    The Davises' claims were not claim-precluded .................................... 15

    B.    Neither Spencer Byrd's nor Allie Nelson's claims were time-barred .................. 17

Conclusion ..........................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Arlin-Golf, LLC v. Village of Arlington Heights,*
    631 F.3d 818 (7th Cir. 2011) ...................................................................16

*Asinor v. District of Columbia,*
    111 F.4th 1249 (D.C. Cir. 2024) ................................................................7

*Austin v. United States,*
    509 U.S. 602 (1993) ...................................................................................13

*Brownmark Films, LLC v. Comedy Partners,*
    682 F.3d 687 (7th Cir. 2012) ....................................................................17

*Carter v. Cook Cnty. Sheriff,*
    142 F.4th 897 (7th Cir. 2025), *cert. denied*, No. 25-401, 2025 WL 3198600
    (U.S. Nov. 17, 2025) ................................................................................ 6

*Chicago & A.R. Co. v. People ex rel. Koerner,*
    67 Ill. 11 (1873) ........................................................................... 11, 12, 15

*Chi., R.I. & P.R. Co. v. People,*
    75 N.E. 368 (Ill. 1905) ..............................................................................12

*Commonwealth Edison Co. v. Elston Ave. Props., LLC,*
    76 N.E.3d 761 (Ill. App. Ct. 2017) ...........................................................16

*Culley v. Marshall,*
    601 U.S. 377 (2024).............................................................................. 2, 4

*Fuentes v. Shevin,*
    407 U.S. 67 (1972) ......................................................................................5

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999)....................................................................................3

*Harrell v. City of New York,*
    138 F. Supp. 3d 479 (S.D.N.Y. 2015) .....................................................2, 5

*HAS Cap., LLC v. Ill. Sec. Dep't of the Sec'y of State*,
   230 N.E.3d 182 (Ill. App. Ct. 2023) ...................................16

*Hayes Freight Lines, Inc. v. Castle*,
   117 N.E.2d 106 (Ill. 1954) ...................................12

*Honda Lease Tr. v. Malanga's Auto.*,
   152 F.4th 477 (3d Cir. 2025) ...................................7

*In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*,
   884 F.3d 746 (7th Cir. 2018) ...................................17

*Lee v. City of Chicago*,
   330 F.3d 456 (7th Cir. 2003) ................................... 6

*Leslie v. Doyle*,
   125 F.3d 1132 (7th Cir. 1997) ...................................7

*Lintzeris v. City of Chicago*,
   216 N.E.3d 151 (Ill. 2023) ................................... 4, 13, 14

*Maddux v. Blagojevich*,
   911 N.E.2d 979 (Ill. 2009) ................................... 11

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ................................... 4, 6

*Nelson v. Colorado*,
   581 U.S. 128 (2017) ...................................3

*O'Regan v. Arb. Forums, Inc.*,
   246 F.3d 975 (7th Cir. 2001) ...................................14

*Pelham v. Rose*,
   76 U.S. 103 (1870) ...................................2, 3

*People ex rel. Birkett v. City of Chicago*,
   758 N.E.2d 25 (Ill. App. Ct. 2001) ...................................17

*People ex rel. Birkett v. Konetski*,
   909 N.E.2d 783 (Ill. 2009) ................................... 13, 14

*People v. Baltimore & O.S.W.R. Co.*,
   92 N.E. 934 (Ill. 1910) ...................................12

*People v. Clark*,
    216 N.E.3d 855 (Ill. 2023) ...................................................................... 13

*People v. Clemons*,
    968 N.E.2d 1046 (Ill. 2012) ....................................................... 13, 14, 15

*People v. Reed*,
    No. 130595, ___ N.E.3d ___, 2025 WL 2981951 (Ill. Oct. 23, 2025) ........................ 12

*People v. Rizzo*,
    61 N.E.3d 92 (Ill. 2016) ...................................................................... 13

*People v. Sharpe*,
    839 N.E.2d 492 (Ill. 2005) ............................................................... 11, 13

*People v. Woods*,
    308 N.E.2d 856 (Ill. App. Ct. 1974) .......................................................... 9

*Rozsavolgyi v. City of Aurora*,
    58 N.E.3d 65 (Ill. App. Ct. 2016) ........................................................... 17

*Rozsavolgyi v. City of Aurora*,
    102 N.E.3d 162 (Ill. 2017) .................................................................. 17

*Spurr v. Pearson*,
    22 F. Cas. 1011 (C.C.D. Mass. 1816) ......................................................... 9

*Towers v. City of Chicago*,
    173 F.3d 619 (7th Cir. 1999) ................................................... 8, 9, 10, 13, 15

*United States v. $8,850*,
    461 U.S. 555 (1983) ........................................................................ 2, 3

*United States v. Bajakajian*,
    524 U.S. 321 (1998) ........................................................................ 13

*United States v. Flores*,
    929 F.3d 443 (7th Cir. 2019) ................................................................. 8

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993) .......................................................................... 5

*United States v. Von Neumann*,
    474 U.S. 242 (1986) ......................................................................... 3

*Waterloo Distilling Corp. v. United States*,
    282 U.S. 577 (1931) ........................................................................................ 2

*Watkins v. Ingalls Mem'l Hosp.*,
    105 N.E.3d 789 (Ill. App. Ct. 2018) .........................................................16

*Weber v. Aetna Cas. & Sur. Co.*,
    406 U.S. 164 (1972) ........................................................................................ 9

## CONSTITUTIONAL PROVISIONS

Ill. Const. art. I, § 11 .............................................................. 10, 11, 13, 14, 15

U.S. Const. amend. IV .........................................................................................1

U.S. Const. amend. VIII ................................................................................ 7, 14

## CODES AND RULES

Chicago Mun. Code § 2-14-103(b) ...................................................................17

Fed. R. Civ. P. 41(a)(1)(A)-(B) ........................................................................16

Seventh Circuit Rule 40(e) .......................................................................... 1, 6, 7

## OTHER AUTHORITIES

Record of Proceedings, Sixth Illinois Constitutional Convention .................................15

# INTRODUCTION

The City of Chicago's impoundment program suffers from significant structural flaws. The City starts by taking cars and refusing to release them unless the owner pre-pays a penalty before any judgment has been entered. For the many who cannot afford to pre-pay unowed penalties, their cars languish in the impound lot, accruing daily storage fees, and further escaping their grasp. Then, if an adverse judgment ultimately *is* entered, the penalties (at all times relevant to this case) were imposed with no regard to whether the vehicle owner bore any "legal responsibility" at all for the misconduct triggering the penalties. Both aspects of this program are unconstitutional, and this Court should so hold.

# ARGUMENT

## I. Chicago's policy of conditioning the return of seized cars on the owners' pre-paying as-yet-unowed debts violates the Due Process Clause and the Fourth Amendment.

The City impounds cars and forcibly holds onto them to coerce owners to pre-pay penalties that have not been ordered due. This, it says, presents no due process or Fourth Amendment problems. For due process, it argues that the system is akin to forfeiture and so it is permissible. But whatever merit there may be to subjecting forfeiture to due process exceptions, that analysis does not extend here, where no property—and no person—has been adjudged guilty. The government simply cannot keep property to coerce payment of a fine that might some day be due. On the Fourth Amendment, the City points to this Court's precedent, which it says closes the matter. The plaintiffs have put forth the argument for why this Court should reconsider its precedent using the Rule 40(e) process, and nothing the City says diminishes that. Each argument is addressed in turn.

**A.** **Due process prohibits Chicago from depriving people of their cars to leverage pre-payment of unowed penalties.**

The City nowhere disputes the plaintiffs' account of how its impoundment program works: by design, the City holds seized vehicles pre-judgment to coerce the owners to pre-pay punitive monetary sanctions that they do not yet owe—and might never owe. Through any lens, that is a paradigmatic deprivation of property without due process of law. For "[w]hatever the due process clause may mean in more complicated scenarios, surely it means the government cannot summarily seize property because a fine *might* be imposed at some point in the future by a neutral judicial officer." *Harrell v. City of New York*, 138 F. Supp. 3d 479, 494-95 (S.D.N.Y. 2015); *cf. United States v. $8,850*, 461 U.S. 555, 562 n.12 (1983) ("The general rule . . . is that absent an 'extraordinary situation' a party cannot invoke the power of the state to seize a person's property without a *prior* judicial determination that the seizure is justified."). The City's contrary arguments lack merit.

1. Foremost, the City equates its regime to a civil *in rem* forfeiture program. Rightly or wrongly, civil forfeiture currently stands as an "exception[]" to the rule that "a government seeking to deprive an individual of her property c[an] do so only *after* a trial." *Culley v. Marshall*, 601 U.S. 377, 397 (2024) (Gorsuch, J., concurring); *see also $8,850*, 461 U.S. at 562 n.12 ("[W]e have previously held that such an extraordinary situation exists when the Government seizes items subject to forfeiture."). According to the City, its coerce-first-judge-later program is "analogous" enough to historical *in rem* forfeitures to wedge itself into that exception as well. City Br. 16.

The analogy fails. Civil forfeiture rests on the "legal fiction" that "[i]t is the property which is proceeded against, and . . . held guilty and condemned . . . ." *Waterloo Distilling Corp. v. United States*, 282 U.S. 577, 581 (1931); *see generally Pelham v. Rose*, 76 U.S. 103, 106 (1870) ("The seizure of the property . . . is made the foundation of the subsequent proceedings. It is essential to

give jurisdiction to the court to decree a forfeiture."). Under Chicago's program, meanwhile, the vehicle simply is held as the roughest form of collateral on an as-yet-unowed monetary debt—a pain point to coerce owners to pre-pay penalties they have not yet been adjudged to owe. The aptest analogy is thus not to civil *in rem* forfeitures, but to a creditor's seizing property pre-judgment—a maneuver roundly rejected throughout our Nation's history. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319-20 (1999). The City's only response? That unlike with a "private creditor," its holding of vehicles to coerce payment of as-yet-unowed penalty debt "serves [its] well-settled interest in deterring [unlawful] conduct." City Br. 21. To state the obvious, however, Chicago has no interest coercing the payment of penalties *before* the payor has been adjudged liable for them. Punishment—or, Chicago's preferred parlance, "deterrence" (City Br. 15)—comes *after* judgment, not before. Textually, that is the essence of due process of law. *Cf. Nelson v. Colorado*, 581 U.S. 128, 136 (2017) ("Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions.").

Equally misdirected is Chicago's disquisition on the facts in *Culley*, *supra*, and *United States v. Von Neumann*, 474 U.S. 242 (1986). City Br. 12-14. The City points out (at length) that the Supreme Court in those cases held that prompt post-seizure hearings were not required for property held for civil forfeiture. But again, the premise of those cases is that civil forfeiture is an "extraordinary situation" in which property can be held pre-judgment. *$8,850*, 461 U.S. at 562 n.12. Whether that premise is right or wrong, Chicago's program is governed, not by the due-process exception, but by the due-process rule: holding someone's property to strong-arm the payment of as-yet-unowed monetary penalties is a textbook deprivation without due process of law.

Likewise without merit is Chicago's renewed emphasis on the "deterrent" purpose of its program. City Br. 15-16. It is surely true, as this Court and the Illinois courts have noted, that the *judgments* imposed under the City's impound program—and the consequences of those judgments—are intended as a "deterrence tool." City Br. 15 (quoting *Lintzeris v. City of Chicago*, 216 N.E.3d 151, 162 (Ill. 2023)). But at risk of belaboring the point: a system that imposes punishment *before* judgment violates due process. That is the cardinal defect in Chicago's impound-as-leverage scheme.

2.    The same result obtains under the *Mathews v. Eldridge* framework. As noted in our opening brief (at p. 22), *Mathews* is a conspicuously poor fit for a case like this, where "the government seeks to deprive an individual of her private property." *Culley*, 601 U.S. at 393 (Gorsuch, J., concurring). Even were *Mathews* the proper framework, however, Chicago points to not one case in which the *Mathews* standard has blessed the government's holding property to coerce pre-payment of unowed penalties. Nor do its factor-by-factor arguments support holding that this case is the unique exception.

*First*, Chicago discounts the plaintiffs' private interests because the plaintiffs' cars were either "secondary" vehicles or were separately eligible to be held under Illinois's forfeiture statute. City Br. 17-18. (In fact, a state judge ruled that Spencer Byrd's vehicle should be *released* from its forfeiture hold, but the City continued to retain it under the impound ordinance. Opening Br. 11.) But that does not diminish the plaintiffs' interests in their cars. Vehicles are an enormous part of people's lives, which is why Nelson, Gant, and Byrd tried, over and over again, to get their cars back. *See* Doc. 173-14 ¶¶ 11-16; Doc. 173-15 ¶¶ 12-16; Doc. 173-16 ¶¶ 11-14. Indeed, the importance of vehicles to daily life is, presumably, why the City has elected to use cars as leverage in the first

place. If it violated Margarita Fuentes's rights to take her stereo before final judgment, *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972), the same is surely true of the plaintiffs' cars here. *Cf. United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 54 (1993) ("In *Fuentes*, we held that the loss of kitchen appliances and household furniture was significant enough to warrant a predeprivation hearing.").

*Second*, the City asserts that the risk of erroneous deprivation is slim because if vehicle owners prevail at one of the City's administrative probable-cause hearings, they can recover their car "with no requirement of payment." City Br. 12; *see also* City Br. 18-19. That, too, does not cure the due-process defect. To start, seized vehicles are held for days or weeks *before* any probable-cause hearing. During that period, they are recoverable only by the owner's pre-payment of the unowed penalties. *Cf. Fuentes*, 407 U.S. at 82 ("[N]o later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred."). If and when probable cause is confirmed, moreover, the due-process violation persists. That Chicago may have probable cause that it will ultimately secure a merits judgment does not give it license to hold the defendant's personal property to leverage pre-payment of a debt on that as-yet-nonexistent judgment. The City's response? That the plaintiffs can't show that the ultimate "judgments" entered will be "erroneous." City Br. 19-20. But that misses the point. No matter how well-founded a final judgment may be (for now, set aside the City's concession that the ordinance is blind to culpability, *see* pp. 7-8, *infra*), the order of operations matters. Penalties, if any, are due *after* judgment, not before. Yet Chicago inverts that presumption of innocence, systematically holding cars for one reason alone: "in order to assert control over them as a means of ensuring payment of an as-yet-unimposed penalty." *Harrell*, 138 F. Supp. 3d at 492; *see also* City

Br. 15 n.5 ("[H]olding impounded vehicles prevents owners from concealing vehicles from the City and avoiding related fines[.]").

*Third*, for the final *Mathews* factor—government interests—the City again invokes deterrence and "giving teeth to the monetary penalties" it may later impose. City Br. 20. On this front, though, we'll end where we started: the government has no legitimate interest in seizing and holding people's property as a means of "giving teeth" to penalties they don't yet owe for violations that have not yet been adjudicated. That is the undisputed design of Chicago's impound system, and it deprives people of their property without due process of law. It is as simple as that.[1]

**B.    The plaintiffs stated a claim that Chicago's holding their cars to leverage prepayment of unowed penalties violates the Fourth Amendment.**

In addition to violating due process, the City's holding of cars to coerce payment also violates the Fourth Amendment. Chicago agrees (not surprisingly) that this theory is barred by circuit precedent. *Lee v. City of Chicago*, 330 F.3d 456 (7th Cir. 2003). And it resists (again not surprisingly) the plaintiffs' suggestion that the Court revisit that precedent under Circuit Rule 40(e). Ultimately, whether to make use of Rule 40(e) is entirely within the panel's discretion. It's true, as the City notes, that a panel this past summer adhered to *Lee*. *See Carter v. Cook Cnty. Sheriff*, 142 F.4th 897, 902 & n.2 (7th Cir. 2025) (noting the plaintiff's "somewhat scattered historical analysis"), *cert. denied*, No. 25-401, 2025 WL 3198600 (U.S. Nov. 17, 2025). Since then, however, yet

---

[1] The City also contends that the plaintiffs' theory "sounds in substantive due process" and fails because the City has a rational basis for holding vehicles hostage—"the deterrent effect" and "enforcing its penalties." City Br. 22, 23. As the district court recognized, however, the plaintiffs' theory is not "one of substantive due process," but rather challenges the City's holding vehicles to coerce penalty payments "*before* th[e] [enforcement] process results in final judgment." App. 42 (citation omitted); *see also* App. 20 (noting that, at the 12(b)(6) stage, the City "interprets" the plaintiffs' theory as a "procedural due process challenge[]").

another circuit has aligned itself on the other side of the split: in September, the Third Circuit embraced "the D.C. Circuit's more recent exploration of the history and original meaning of the Fourth Amendment demonstrating that its protections apply to both the initial seizure and ongoing retention of private property." *Honda Lease Tr. v. Malanga's Auto.*, 152 F.4th 477, 489 (3d Cir. 2025) (citing *Asinor v. District of Columbia*, 111 F.4th 1249, 1254 (D.C. Cir. 2024)); *see also id.* ("We thus hold that when the government seizes property, the Fourth Amendment requires that its initial seizure and continued retention be reasonable."). If the panel is inclined to exercise its authority under Rule 40(e), we'd respectfully submit that this issue, in this case, is a sound candidate.

## II. Chicago's impound program contravened state and federal protections against excessive fines because, in its design, it penalized people with no regard for culpability.

During the period relevant here, the City's impound program imposed penalties without regard to whether the owner was legally responsible in any way for the underlying offense. In its design, those penalties exceeded the constitutional bounds of both the U.S. and Illinois constitutions.

### A. The complaint plausibly alleged that Chicago's *in personam* penalties violated the federal Excessive Fines Clause.

1. Chicago does not deny that facial challenges can properly be brought under the Eighth Amendment's Excessive Fines Clause. *See* Opening Br. 30. Nor does the City deny that a law that imposes punishment "for no offense at all is, as a matter of mathematics, disproportionate." *Leslie v. Doyle*, 125 F.3d 1132, 1135 (7th Cir. 1997); *see also* Opening Br. 31. Nor does the City deny what it conceded below: that on its face, its challenged ordinance is just such a law. By imposing *in personam* penalties on vehicle owners with no regard to whether they were in any way "legally responsible for the underlying offense," the ordinance suffers a systemic design flaw under the Eighth Amendment. *See* Doc. 187 ¶ 24 ("[Statement 24]: Under the ordinances that

existed when Plaintiffs' cars were impounded, . . . vehicle owners could not avoid liability for administrative penalties at the full hearing by showing that they were not legally responsible for the offense, did not participate in the offense, and did not know or have reason to know that the illegal conduct was likely to occur." [Response:] Undisputed.").

The City maintains that this Court's decision in *Towers v. City of Chicago* insulates its ordinance from facial challenge because the Court there rejected several plaintiffs' as-applied challenges to the ordinance. 173 F.3d 619 (7th Cir. 1999). Because the ordinance was upheld as to Sandra Towers and her co-plaintiffs, the logic goes, it must needs have *some* valid applications. City Br. 34-35. Yet the panel in *Towers* had no occasion to consider whether Chicago's ordinance rested on the flawed premise presented here: that, as the City conceded below, the law mandates penalties with no regard for whether the defendant was "legally responsible" in any way for the underlying misconduct. App. 34. Rather, the parties in *Towers* disputed only whether, factually, Ms. Towers and her co-plaintiffs were blameless, culpable, or somewhere in between. *Towers*, 173 F.3d at 625 (resolving excessive-fines issue "based on the facts of [the] particular case"); *id.* ("We cannot accept . . . the notion that the plaintiffs must be considered completely lacking in culpability."). Against that backdrop, the panel's resolution of the fact-bound arguments pressed in *Towers* did not *sub silentio* resolve whether Chicago's ordinance suffers the more basic design flaw raised here. For "[i]t is well-established 'that the unexamined assumptions of prior cases do not control the disposition of a contested issue.'" *United States v. Flores*, 929 F.3d 443, 450 (7th Cir. 2019). Nor is there any reason to think the panel in *Towers* would have upheld the ordinance on its face had Chicago admitted then what it admits now: that in its design, the ordinance is indifferent to whether its target was in any degree "legally responsible for the underlying offense." App. 34.

The City also posits that the logic of *Towers* necessarily is inconsistent with the plaintiffs' facial challenge. According to *Towers*, the City notes, a vehicle owner must "accept[] the risks inherent to th[e] loss of control" of his or her vehicle, and governments have the power "to sanction a vehicle owner who does not ensure that others with access to the vehicle do not place illegal items in it." *Towers*, 173 F.3d at 625. But there is a gulf between that articulation of Chicago's law and the reality the City has since conceded. The "basic concept" of our justice system is that "legal burdens should bear some relationship to individual responsibility or wrongdoing." *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972); *Spurr v. Pearson*, 22 F. Cas. 1011, 1014 (C.C.D. Mass. 1816) (Story, J.) ("Why should a [person] . . . be responsible for the acts of others, in which he has had no participation or connivance?"). For its part, however, the City freely acknowledges that its ordinance was designed to penalize indiscriminately—so blind to whether its defendants were "legally responsible" for wrongdoing that it punished victims and victimizers alike.

The experience of Jerome Davis and Veronica Walker-Davis illustrates the point. The couple dropped off their damaged car at an autobody shop. Doc. 29 ¶ 99. Where an employee proceeded to misappropriate it. *Id.* ¶ 100. And operate it with a revoked license. *Id.* ¶ 100. While the shop actively lied to the Davises about the status of repairs. *Id.* ¶¶ 101-02. Bluntly, the Davises were themselves the victims of a crime. *See People v. Woods*, 308 N.E.2d 856, 859 (Ill. App. Ct. 1974) ("'[J]oyriding escapades' are not to be treated as 'thefts' but rather as 'Criminal Trespass to Vehicles . . . .'"). Yet Chicago's ordinance penalized them all the same. And the City stands fully behind that result today: in the Davises' case—the City insists—the ordinance worked exactly as designed. City Br. 34 n.10. If the Court believes *Towers* blesses such a penalty (and such a maximalist reading of *Towers* is far from the best one), we'd respectfully request that the panel say so

unequivocally so that the en banc Court or the Supreme Court are under no misapprehension about the Circuit's Excessive Fines Clause precedent.

2.     That leaves the plaintiffs' as-applied challenge—or more precisely, the Davises', since that of the other plaintiffs is controlled by *Towers* (Opening Br. 34-35). On this front: two points. First, as noted in our opening brief (at p. 34), the merits of the Davises' excessive-fines count may be best left for remand, given the district court's threshold res judicata ruling. Second, the City's position spotlights the gulf between the impound ordinance as the Court understood it in *Towers* and the ordinance as the record here confirms it operated in reality. In rejecting Sandra Towers's as-applied challenge, the panel in *Towers* accepted the premise (seemingly uninterrogated by the parties) that Chicago's ordinance serves to penalize people who bear *some* degree of culpability for their property's misuse—who failed "to ask borrowers hard questions about the uses to which the vehicle would be put," for instance, or failed to heed "misgiving about the items that might find a temporary home in that vehicle." 173 F.3d at 626; *see also id.* at 625 ("[B]ecause the plaintiffs did not report their cars stolen, they must have given some degree of consent to the use of their cars by others, either before or after that use."). Yet the Davises' experience gives the lie to that view. Their "culpable" act? Dropping off their car at a repair shop and falling prey to criminal trespass. A law that penalizes crime victims in this way suffers from grave defects in its design. At a minimum, the Davises' excessive-fines count is a plausible one.

**B.     Chicago's impound program violated Illinois's Proportionate Penalties Clause.**

The City makes two arguments defending its impound program against the Proportionate Penalties Clause. Foremost: that unlike the federal Excessive Fines Clause, Illinois's Proportionate Penalties Clause applies, not to "[a]ll penalties" (as the Clause says), but only to criminal-court

penalties. Second, that even if the Proportionate Penalties Clause does apply here, Chicago's penalty scheme passes muster. The City is wrong on both counts.

1.      The City contends, first, that the Proportionate Penalties Clause is "categorically inapplicable to civil fines." City Br. 24. That is incorrect. The text of Article I, Section 11 could hardly be clearer: "*All penalties* shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. art. I, § 11 (emphasis added). That language "must be read and understood according to the most natural and obvious meaning . . . in order to avoid eliminating or extending its operation." *Maddux v. Blagojevich*, 911 N.E.2d 979, 988 (Ill. 2009). And the most "natural and obvious meaning" of *all penalties* is that it includes all penalties, not just a subset of them.

Precedent amply supports that view. Enacted in 1970, the current version of the Proportionate Penalties Clause drew on predecessor language from the Illinois Constitution of 1870 (and earlier iterations before that). The wording of the first clause "was changed from '[a]ll penalties shall be proportioned to the nature of the offense' to '[a]ll penalties shall be determined . . . according to the seriousness of the offense.'" *People v. Sharpe*, 839 N.E.2d 492, 500 (Ill. 2005). But, the Illinois Supreme Court has remarked, nothing in the constitutional record "evince[d] any intent on the part of the framers to change the meaning of the first clause." *Id.* And critically, the court repeatedly entertained challenges under the 1870 provision to punishments imposed via civil-enforcement actions. In 1873, for example, the court reasoned that a statute mandating forfeiture of railroad franchises (in a civil-enforcement action) could "amount to a fine of millions of dollars." *Chicago & A.R. Co. v. People ex rel. Koerner*, 67 Ill. 11, 26 (1873). Such a regime, the court admonished, raised grave questions under the Proportionate Penalties Clause. For "[a] law admitting of

but one penalty, and that of the harshest possible character, will necessarily be subjected by the courts to close criticism and a strict construction." *Id.* at 27; *see also id.* at 26 ("Is not this a violation of the spirit of that constitutional provision which says, in terms, that 'all penalties shall be proportioned to the nature of the offense?'"). Nor is that decision an outlier in this regard. While later challenges to civil penalties would fail on other grounds, the Illinois Supreme Court time and again accepted that the Proportionate Penalties Clause placed *some* limit on governmental sanctions imposed in civil-enforcement proceedings. *See Hayes Freight Lines, Inc. v. Castle*, 117 N.E.2d 106, 112 (Ill. 1954); *People v. Baltimore & O.S.W.R. Co.*, 92 N.E. 934, 938 (Ill. 1910); *Chi., R.I. & P.R. Co. v. People*, 75 N.E. 368, 371 (Ill. 1905) ("The amount of a penalty to be inflicted must and does largely rest in the sound discretion of the General Assembly, and it is only when the minimum penalty is flagrantly and plainly oppressive and disproportioned to the offense for which it is inflicted that the courts will interfere and refuse to enforce the enactment."). Simply, "all penalties" was understood to mean just that: "all penalties." And what the City admits are its "civil fines" readily qualify. City Br. 24 (emphasis omitted).

The City observes that a title was added to Article I, Section 11, in 1970, labeling the provision a "Limitation of Penalties after Conviction." City Br. 24. Whatever Article I, Section 11, might have meant for the century *before* 1970, therefore, the City suggests that the 1970 title signals a fundamental change in the provision's compass. *But cf. People v. Reed*, No. 130595, ___ N.E.3d ___, 2025 WL 2981951, ¶ 31 (Ill. Oct. 23, 2025) ("[W]e are mindful that a statute's title cannot be used to limit the plain meaning of statutory text." (internal quotation marks omitted)). Again, however, the Illinois Supreme Court held otherwise. Had the provision emerging from the 1970 constitutional convention been understood to (atextually) narrow the natural meaning of "all

penalties," the constitutional record would surely have betrayed such an intent on the part of the drafters. But the opposite is true: as the Illinois Supreme Court has acknowledged, the opening clause of Article I, Section 11, was understood to retain its pre-1970 meaning. *Sharpe*, 839 N.E.2d at 500.

Modern Illinois courts recognize that the Proportionate Penalties Clause "provides 'a limitation on penalties beyond those afforded by the eighth amendment.'" *People v. Clark*, 216 N.E.3d 855, 871 (Ill. 2023); *see also People v. Clemons*, 968 N.E.2d 1046, 1056-57 (Ill. 2012) (holding that the Proportionate Penalties Clause "went beyond the framers' understanding of the eighth amendment and is not synonymous with that provision"). It applies whenever there is a "direct action by the government to inflict punishment." *People v. Rizzo*, 61 N.E.3d 92, 104-05 (Ill. 2016); *see also Lintzeris*, 216 N.E.3d at 160 (describing a fine as "intended to be punitive or act as a deterrent"). There can be no doubt that the City inflicts punishment through its impoundment penalties. The City lauds the deterrent effect of its penalties. *E.g.*, City Br. 31 (describing the "important deterrent function" the penalty serves). "Deterrence, however, has traditionally been viewed as a goal of punishment . . . ." *United States v. Bajakajian*, 524 U.S. 321, 329 (1998). *See also Austin v. United States*, 509 U.S. 602, 610 (1993) (holding that a civil sanction "is punishment" if it serves some "deterrent purposes"); *Towers*, 173 F.3d at 624 (discussing how the City's impoundment fines serve a punitive purpose). Because the City imposes administrative penalties to inflict punishment, the Proportionate Penalties Clause applies.

The City invokes two cases to limit the Proportionate Penalties Clause, *People ex rel. Birkett v. Konetski*, 909 N.E.2d 783, 799 (Ill. 2009), and *Lintzeris v. City of Chicago*, 216 N.E.3d 151 (Ill. 2023), but neither bears that weight. *Konetski* concluded that Illinois's sex-offender registration

statute violated neither the Eighth Amendment nor the Proportionate Penalties Clause because it was not "a direct action to inflict punishment." 909 N.E.2d at 799. It distinguished not between civil and criminal but between punitive and nonpunitive. And here, there is no dispute that Chicago's impound penalties fall squarely on the punitive end of the spectrum. (To the extent that *Konetski* deemed the Proportionate Penalties Clause "coextensive" (*id.*) with the Eighth Amendment, moreover, that is no longer good law following *Clemons* and its holding that the two provisions are "not synonymous," 968 N.E.2d at 1057.) Nor does *Lintzeris* move the needle. According to the City, *Lintzeris* stands for the proposition that Chicago's impound penalties are civil, not criminal penalties. City Br. 24-25. There is certainly no dispute there. Again, however, the plain text and historical understanding of "all penalties" supports, not a line between criminal-court and civil, but between punitive and non-punitive. That Chicago's impound penalties might not be criminal may be relevant for the applicability of *some* constitutional provision (e.g., double-jeopardy protections, *Lintzeris*, 216 N.E.3d at 163). But it does not exempt them from Article I, Section 11's broad compass. At base the syllogism is an easy one. Article I, Section 11 applies to "[a]ll penalties." Chicago's impound penalties are, well, "penalties." So Article I, Section 11 applies to them.

    2.    The City next argues that its impoundment penalties are proportionate. It does this without grappling with the fundamental flaw of the ordinances: they impose penalties whether or not the vehicle owners were "legally responsible for the underlying offense" in any way. App. 34. The City instead focuses its attention on the facts of each plaintiff, casting them as evildoers contributing to the city's crime statistics, an odd choice given that this claim is on appeal from summary judgment, where all facts and reasonable inferences from those facts are to be drawn in favor of the party who lost. *O'Regan v. Arb. Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001). Because

*Towers* approved these penalties, the City argues, they also pass muster under the Proportionate Penalties Clause. But *Towers* did not address the Proportionate Penalties Clause, so its reach here is limited at best. The Proportionate Penalties Clause demands that "penalties be determined with the objective of rehabilitating the offender and in accordance with the seriousness of the offense." *Clemons*, 986 N.E.2d at 1057 (quoting 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2685). And by design, Chicago's impound penalties are blind to the seriousness of the defendant's offense—or even whether the defendant was legally responsible for any offense at all. App. 34; *cf. Koerner*, 67 Ill. at 24 ("The legislature can not raise a conclusive presumption of guilt against a natural person from an act that may be innocent in itself, taking from him the privilege of showing the actual innocence or propriety of the act, and confiscating his property as a penalty for the supposed offense."). Both facially and as applied to the facts of these plaintiffs, the penalties are nothing short of disproportionate. *See* Opening Br. 36-38. They cannot stand.

## III. Several of the district court's procedural rulings were error.

### A. The Davises' claims were not claim-precluded.

The Davises voluntarily dismissed their state-court appeal in a document that was silent as to whether the dismissal was with prejudice or without. Doc. 34-1, at 44. The City nowhere denies that, under Illinois law, a voluntary dismissal that is silent in this way is considered a dismissal without prejudice (and hence without res judicata effect). *Compare* Opening Br. 39, *with* City Br. 40-41. Because the Davises' voluntary dismissal was "agreed," however, the City maintains that the opposite rule obtains: where parties *agree* that the plaintiff's complaint shall be voluntarily dismissed (as opposed to its being dismissed unilaterally), the City asserts that the dismissal is with prejudice unless specified otherwise.

The City cites no authority for that counterintuitive result. *Cf.* Fed. R. Civ. P. 41(a)(1)(A)-(B) (drawing no distinction between the preclusive effect of voluntary dismissals executed unilaterally or by stipulation). The City observes, for example, that a "voluntary dismissal with prejudice pursuant to settlement agreement [i]s res judicata under Illinois law." City Br. 40 (citing *Arlin-Golf, LLC v. Village of Arlington Heights*, 631 F.3d 818, 822 (7th Cir. 2011)). But that truism says nothing about the res judicata effect of a voluntary dismissal that is conspicuously *not* with prejudice. The City remarks on the claim-preclusive effect of "consent judgments." City Br. 40. But whatever might be said of the preclusive import of a *judgment*, "[g]enerally, a voluntar[y] dismissal does not constitute a final judgment on the merits for purposes of *res judicata*." *Watkins v. Ingalls Mem'l Hosp.*, 105 N.E.3d 789, 805 n.4 (Ill. App. Ct. 2018). The City also dwells on the general proposition that "settlement agreements" that are adopted by an Illinois state court can have the same preclusive effect as a judgment. City Br. 40, 41. Under Illinois law, however, those instruments are "construed to give effect to the intention of the parties." *Commonwealth Edison Co. v. Elston Ave. Props., LLC*, 76 N.E.3d 761, 766 (Ill. App. Ct. 2017). Many, doubtless, do reflect the parties' intention to preclude further litigation. But that says nothing about whether a voluntary dismissal reflects that intention when it embodies, not a judgment, but the "withdraw[al]" of the plaintiff's complaint (Doc. 34-1, at 44) and when it says nothing one way or the other about further litigation. In short, the City cites no authority for its blanket rule that, unlike every other form of voluntary dismissal, an "agreed" one is presumptively claim preclusive. *See generally HAS Cap., LLC v. Ill. Sec. Dep't of the Sec'y of State*, 230 N.E.3d 182, 189 (Ill. App. Ct. 2023) ("A party who invokes *res judicata* has the burden of showing its application."). The district court's dismissal was error and should be reversed.

**B.     Neither Spencer Byrd's nor Allie Nelson's claims were time-barred.**

1.     Byrd's and Nelson's state-law claims are not time-barred. The City maintains that a statutory amendment in 1986 extended the Tort Immunity Act and its statute of limitations to damages claims for constitutional violations. City Br. 41-43. Post-1986, however, the Illinois Court of Appeals hewed to its original position: the Act doesn't apply to constitutional claims. *People ex rel. Birkett v. City of Chicago*, 758 N.E.2d 25, 30 (Ill. App. Ct. 2001). And although a panel of the intermediate court took a different view in 2016, *Rozsavolgyi v. City of Aurora*, 58 N.E.3d 65, 95 (Ill. App. Ct. 2016), the Illinois Supreme Court vacated that ruling on procedural grounds, *Rozsavolgyi v. City of Aurora*, 102 N.E.3d 162, 170 (Ill. 2017); *cf. In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*, 884 F.3d 746, 751 (7th Cir. 2018) ("If the state's supreme court has not yet addressed the issue, the federal court should consult and follow the decisions of intermediate appellate courts to predict how the supreme court would act given the chance, unless there is a convincing reason to predict the state's highest court would disagree." (internal quotation marks omitted)). In any event, whatever might be said of Byrd's and Nelson's state-law request for nominal damages, the City does not dispute that the Tort Immunity Act's limitations period poses no barrier to the equitable relief they seek. *See* Opening Br. 41.

2.     Byrd's federal counts likewise should not have been dismissed as time-barred. Procedurally, the normal course is to allow discovery on the affirmative defenses, rather than dismiss at the pleadings. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). And on substance, the continuing-violations doctrine kept Byrd's federal counts alive while the City continued to violate his rights. On his due-process count, for example, the City's enforcement against him was live until at least October 2017, when the circuit court entered its final order affirming the agency decision. *See* Doc. 95-1, at 9. It was not until the end of that period that his fines

became debts due to the City. Doc. 185-2, at 9 (Chicago Mun. Code § 2-14-103(b)). Certainly for Byrd's due-process and Fourth Amendment counts, that is the date that matters for statute-of-limitations purposes, not the date Byrd first stood in front of the City regarding his car.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Dated: December 19, 2025

Robert Pavich
PAVICH LAW GROUP, PC
30 West Monroe Street, Suite 1310
Chicago, IL 60603
(312) 690-8400
rpavich@pavichlawgroup.com

Respectfully submitted,

/s/ Diana K. Simpson
Diana K. Simpson
    *Counsel of Record*
Kirby Thomas West
Samuel B. Gedge
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
diana.simpson@ij.org;
kwest@ij.org;
sgedge@ij.org

*Counsel for Appellants*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Cir. R. 32(c) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 5,706 words.

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Equity A font.

Dated: December 19, 2025

/s/ Diana K. Simpson
Diana K. Simpson
*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2025, I electronically filed the foregoing with the

Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the

CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the CM/ECF system.

Dated: December 19, 2025         /s/ Diana K. Simpson
                                          Diana K. Simpson
                                          *Counsel for Appellants*